**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

DARRELL MORA, ET AL.                        CIVIL ACTION NO. 22-0615

VERSUS                                      JUDGE S. MAURICE HICKS, JR.

TEXAS PETROLEUM INVESTMENT                  MAGISTRATE JUDGE AYO
COMPANY, ET AL.

**MEMORANDUM RULING**

Before the Court in this maritime negligence case is a Motion for Summary
Judgment filed by Texas Petroleum Investment Company ("TPIC") and Campbell
Consulting Services, LLC ("CCS").  See Record Document 30.  Defendants seek
dismissal of all of the negligence claims of Plaintiffs Darrell Mora ("Mora") and Darlyn
Mora.  Plaintiffs opposed the motion.  See Record Document 35.  Defendants replied.
See Record Document 36.  For the reasons set forth below, Defendants' Motion for
Summary Judgment is **DENIED**.

**BACKGROUND[1]**

In early May 2021, TPIC, in its capacity as owner and operator of the Belle Isle #1-
69 well (the "Well"), decided to plug and abandon ("P&A") the Well.  TPIC secured CCS
to assist with the P&A job.  Mark Campbell ("Campbell") was the CCS company man for
TPIC on the P&A project.  TPIC maintains that CCS was an independent contractor, while
Plaintiffs contend CCS was an employee of TPIC.

---

[1] The facts set forth in the Background Section are drawn from Defendants' Statement of
Uncontested Material Facts (Record Document 30-2), Plaintiffs' Response to Defendants'
Statement of Uncontested Material Facts (Record Document 33), Plaintiffs' Statement of
Material Facts as to Which There Exists a Genuine Issue to be Tried (Record Document
35-1), and Response to Plaintiffs' Statement of Material Facts as to Which There Exists
a Genuine Issue to be Tried (Record Document 36-1).

On May 16, 2021, the pipe ram on the Well blowout preventer ("BOP") failed, which led to a loss of containment.  This was the first blowout at the Well.  Following the loss of containment on May 16, 2021, TPIC hired well-control specialist Dicky Robichaux ("Robichaux") of Wild Well Control, Inc. ("WWC") to consult on pressure-control operations as an independent contractor.  Robichaux arrived on site on May 19, 2021.  Robichaux enlisted Mora, another WWC employee, to assist with nighttime pressure-control operations, but Mora was released shortly thereafter.  Mora was not present at the Well site on May 23, 2021.  He returned to the Well site on May 24, 2021.

On May 23, 2021, a second blowout occurred at the Well resulting in another loss of containment.  Prior to the May 23, 2021 blowout, WWC classified its work at the Well site as Level 2, which means WWC was merely performing consulting work on pressure-control issues.  WWC charges customers approximately $1,500 per day for Level 2 work.  Immediately after the May 23, 2021 blowout, Robichaux notified his supervisors at WWC that the Well was releasing hydrocarbons and "was doing so in a fashion that was as dangerous as [he had] ever seen in [his] entire career."   Record Document 30-4 (Robichaux Deposition) at 17-18.  Robichaux had not seen "as severe a scenario as what [he] was witnessing" on May 23, 2021 because the loss of containment was horizontal and vertically down as opposed to up the top of the stack, which did not allow the escaping gas to disperse.  Id. at 21.  Following this discussion with Robichaux, WWC elevated the Well job to Level 4.  This higher level covered jobs involving an uncontrolled well and increased the day rate to approximately $10,000 per day due to the high level of danger.

It is uncontested that WWC was aware of the dangerous condition of the Well site.  However, the parties contest the level of control WWC possessed at the Well.  Defendants

maintain that after the elevation to Level 4, WWC was in charge of all well control operations moving forward.  See id. at 25-27.  According to Defendants, such control included the following:  which WWC employees would be mobilized; whether to pull employees off the job; what equipment needed to be shipped to the Well; and what other personnel needed to accompany the equipment.  See id. at 15-16; Record Document 30-5 (Mora Deposition) at 8-10.  In other words, following the May 23, 2021 blowout, Defendants submit that WWC had full control of all activities undertaken to regain containment of the Well, including well control, emergency procedures, Level 4 work, and firefighting ("FiFi") barge operations.  See Record Document 30-4 at 25-30.  Defendants assert that Robichaux and his supervisor, Carlton Burleson, had overall authority with respect to all well control operations and that he possessed the ability to advise WWC that the job was too dangerous and operations should cease.  See id. at 25-28.  In fact, Defendants contend that Robichaux advised WWC to cease operations after the May 23, 2021 blowout.  Mora disputes that Robichaux advised WWC to cease operations.  Instead, Mora cites Robichaux's deposition, wherein he stated, "those conversations [not liking the job and not continuing the job] actually took place throughout the job, even after [WWC] had told TPIC they would pull off location if they didn't start behaving themselves."  Id. at 28.

At 5:00 p.m. on May 23, 2021, hours after the second blowout occurred, WWC made the decision to move forward with operations.  On May 24, 2021, WWC's crew spent most of the day rigging up a FiFi barge, getting additional crewmembers on site, and developing a site safety plan.  The Fii barge was rented by WWC, rigged up by WWC on May 24, 2021, and used by WWC on May 25, 2021.

When Mora arrived on site on May 24, 2021, the Well was releasing gas in multiple directions.  WWC had the ability to walk off the job at this – and any – time.  At 1:30 p.m. on May 24, 2021, Robichaux entered the "hot zone" and noted the gas flow from the wellbore appeared to be stronger.  Id. at 35.  Two hours later, Robichaux again entered the "hot zone" to rig up hoses for fire monitors used to wash off the decks that were "very slippery and dangerous."  Id. at 35-36.  By 6:00 p.m. on May 24, 2021, WWC had washed the decks down, pulled the FiFi barge out of the "hot zone," and installed containment booms.  Id. at 36.

The following detailed facts surrounding the May 25, 2021 events leading up to the flashover are undisputed; yet, Mora disputes any implication that WWC alone embarked on the FiFi barge to control the well.  At 11:00 a.m. on May 25, 2021, the  crew on the FiFi barge, which was powered by a tugboat, began moving into location and maintained a water curtain through two fire monitors directed at the Well.  There was discussion about how to get the crane boom out of the way.  A couple of barges were actually removed before moving the FiFi barge under the designated crane barge outside of the slip and loading out a breathing cascade system to support operations.  After 12:00 p.m. on May 25, 2021, the crew traveled back to the FiFi barge to visually assess the BOP and evaluate how the crane would be moved, if possible, to conduct snubbing operations.  While spraying water on the gas plume to manipulate in order to access the crane, the gas still flowing from the Well ignited and a flashover occurred.  The flashover caused serious burn and orthopedic injuries to Mora.

According to Defendants, Robichaux was directing Mora and all of the WWC personnel on the FiFi barge immediately before the flashover.  Defendants point to Mora's

deposition, wherein Mora admitted that even though Campbell was on the FiFi barge, he had no dealings with him immediately prior to the flashover.  See Record Document 30-5 at 64-66.  Moreover, Mora could not recall hearing Campbell instruct any of the WWC crew during that time frame.  See id.  Conversely, Mora contends that TPIC and CCS were in charge of all well control operations at all relevant times.  Mora testified that on the day of the flashover, Campbell was directing WWC as to what to do.  Specifically, Mora stated that "we had to go through Campbell to do anything we did."  Record Document 30-5 at 12.  Plaintiffs also presented the Court with a TPIC Incident Organization Chart in relation to the blowouts.  See Record Document 35-5 at 12.  The chart was part of the TPIC Incident Action Plan (Record Document 35-5 at 5-14).  The TPIC post-blowout organizational chart does not even list WWC.

Plaintiffs filed suit on January 25, 2022 in the Sixteenth Judicial District Court for the Parish of St. Mary.  See Record Document 1-1.  The case was removed to the United States District Court for the Western District of Louisiana on March 3, 2022.  See Record Documents 1 & 4.  Plaintiffs allege that the flashover incident was caused by the negligence and gross negligence of Defendants.  See Record Document 1-1 at ¶ 24.  More specifically, Plaintiffs contend that the second blowout on May 23, 2021 was caused by Defendants' blatant disregard for safety rules such as the double barrier rule.  See id.; Record Document 35 at 21-33.[2]  Defendants have now filed a Motion for Summary

---

[2] Plaintiffs submit that Defendants chose to proceed in disregard of a high degree of danger that was known.  See Record Document 35 at 32.  They allege that their summary judgment evidence shows that TPIC and CCS "blatantly and purposefully disregarded . . . basic safety rules of well control before the [second] blowout of May 23, 2021."  Id. at 22.  They point to the testimony of Travis Wells, the TPIC engineer in charge of the P&A job, who stated that he specified that the BOPs have a working pressure of 15,000 PSI.  See id. (citing Record Document 35-12).  Plaintiffs contend that "Campbell chose to

Judgment seeking dismissal of all of Plaintiffs' maritime negligence claims.  See Record

Document 30.

## LAW AND ANALYSIS

**I.      Rule 56 Standard.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil

Procedure when "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Quality Infusion Care, Inc. v. Health Care Serv.

Corp., 628 F.3d 725, 728 (5th Cir. 2010).  "Rule 56[(a)] mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial."  Patrick v. Ridge, 394

F.3d 311, 315 (5th Cir. 2004).

"A party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the

pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

disregard the specifications of the project engineer and ordered a blind shear ram with a
pressure rating of 10,000 PSI rather than 15,0000 PSI specified."  Id. at 32.  Moreover,
after doing so, Campbell failed to disclose what he had done even when he knew
pressures were exceeding the 10,000 PSI of the tool he had ordered and installed.  See
id.    Plaintiffs submit that Campbell mislead or lied to Robichaux about the working
pressure of the tool and, despite his knowledge, ordered men to proceed with work over
single barrier rated for only 10,000 PSI when he knew pressures on the well were
exceeding 10,000 PSI.  See id. at 32-33.  According to Plaintiffs, at all relevant times
during the project, Robichaux relied on Campbell's representation that the blind shear
rams were rated at 15,000 PSI.  See id. at 25 (citing Record Document 35-18).  Despite
the lower rated blind shear ram, Campbell decided to attempt to repair the pipe ram on
the lower double so he could remove the upper double.  See id. at 26.  Plaintiffs allege
that Defendants made this decision because they wanted to lower the height of the stack
to avoid the cost and delay of getting a larger crane to proceed with the snubbing job.
See id. at 26, 33.

the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. See Tubacex, Inc. v. M/V Risan, 45 F.3d 951, 954 (5th Cir. 1995).

If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). To satisfy this burden, the nonmovant must identify specific evidence in the record, and articulate the "precise manner" in which that evidence supports the claim. Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994). Unsupported allegations that are conclusory in nature are insufficient to avoid summary judgment. See Simmons v. Lyons, 746 F.2d 265, 269 (5th Cir. 1984). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). The nonmovant cannot rely on some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. See id.

**II.    General Maritime Law.[3]**

Under general maritime law, a showing of negligence requires: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached the duty; (3) the plaintiff sustained

---

[3] This is an action for damages brought under the Admiralty Jurisdiction of the United States for a maritime tort. See Record Document 1-1 at ¶ 4.

damages; and (4) the defendant's wrongful conduct caused the plaintiff's damages.  See

ADM Int'l SARL v. River Ventures, LLC, 441 F.Supp.3d 364, 375 (E.D. La. 2020) (citing

In re Cooper/T. Smith, 929 F.2d 1073, 1077 (5th Cir. 1991).  "The elements of a maritime

negligence cause of action are essentially the same as land-based negligence under the

common law."  Withhart v. Otto Candies, LLC, 431 F.3d 840 (5th Cir. 2005).

In maritime tort cases, a plaintiff is owed a duty of ordinary care under the

circumstances.  See Daigle v. Point Landing, Inc., 616 F.2d 825, 827 (5th Cir. 1980).

Determination of a tortfeasor's duty is a question of law.  See In re Great Lakes Dredge

& Dock Co. LLC, 624 F.3d 201, 211 (5th Cir. 2010).  The determination of the existence

and scope of a duty "involves a number of factors, including most notably the

foreseeability of the harm suffered by the complaining party."  Consol. Aluminum Corp. v.

C.F. Bean Corp., 833 F.2d 65, 67 (5th Cir. 1987) ("[D]uty may be owed only with respect

to the interest that is foreseeably jeopardized by the negligent conduct.").  A harm is

reasonably foreseeable if "harm of a general sort to persons of a general class might have

been anticipated by a reasonably thoughtful person, as a probable result" of a defendant's

conduct.  In re Great Lakes, 624 F.3d at 211 (5th Cir. 2010).[4]  The negligence must also

be the legal cause of the damage, which is something more than "but for" causation –

"the negligence must be a substantial factor in causing the injuries."  Id. at 213–14 (citation

and quotations omitted).  "If there are concurrent causes of an accident, the proper inquiry

is whether the conduct in question was a substantial factor in bringing about the accident."

---

[4] The general maritime negligence standards are not remarkably different from Louisiana
state standards, except that state law would apply a "duty/risk" analysis, rather than a
"reasonably foreseeable" analysis.  Dean v. Ramos Corp., 00-1621 (La. App. 5 Cir.
2/28/01), 781 So. 2d 796, 802.

Starr Indem. & Liab. Co. v. Am. River Transportation Co., LLC, 665 F.Supp.3d 787, 794

(E.D. La. 2023).   The common law negligence doctrines of proximate causation and

superseding cause apply to maritime negligence claims.  See Poincon v. Offshore Marine

Contractors, Inc., 9 F.4th 289, 297 (5th Cir. 2021).

**III.      Analysis.**

Defendants submit summary judgment is appropriate because they owed no duty

to Mora as a matter of law.  First, they argue there was no duty to protect Mora against

the flashover because it was an inherent risk of the work WWC was hired to perform.

Second, Defendants contend the flashover and Mora's injuries were not probable

consequences of any alleged negligent acts with respect to the May 23, 2021 blowout;

thus, the flashover was not within the scope of any duty Defendants owed to WWC

employees such as Mora.  Additionally, Defendants argue WWC's conduct constituted a

superseding, intervening act such that they cannot be held liable for Mora's claimed

damages.  Mora contests each of these grounds and asserts summary judgment is not

proper in this case.

**Inherent Risk**

Defendants argue that TPIC, as owner/operator of the Well, owed no duty to

protect the employees of its independent contractor, WWC, from the risks inherent in

carrying out WWC's well-control operations at the Well following the May 23, 2021

blowout.  The defense position that there exists no duty to protect an independent

contractor's employee from risks inherent in carrying out a contract in situations involving

an open and obvious defect that the independent contractor was retained to fix or inspect

is based on a line of cases involving claims under Section 905(b) of the Longshore and

Harbor Workers' Compensation Act.  See West v. U.S., 361 U.S. 118, 80 S.Ct. 189 (1959); Hess v. Upper Miss. Towing Corp., 559 F.2d 1030 (5th Cir. 1977); Hill v. Texaco, Inc., 674 F.2d 447 (5th Cir. 1982); Manson Gulf, L.L.C. v. Modern American Recycling Serv., Inc., 878 F.3d 130 (5th Cir. 2017).[5]  Conversely, Plaintiffs argue that summary judgment based on legal principles underlying 33 U.S.C. § 905(b) and/or cases concerning Section 905(b) is inapplicable because Defendants are not vessel owners and Mora is not a longshoreman.  Moreover, Plaintiffs argue that Defendants have not demonstrated why the much narrower duty under Section 905(b) is applicable to this matter rather than the duty of ordinary care pursuant to general maritime negligence claims.

In Humphrey v. Tidewater GOM, Inc., 616 F. Supp. 3d 538 (M.D. La. 2022), the district court discussed general principles of maritime negligence law and noted that as applied to vessel owners and operators, "[i]t is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." Id. at 545 (citations omitted).  Yet, a different standard applies under Section 905(b) to a longshoreman working on a vessel.  See id. Section 905(b) provides a statutory negligence action against the ship.  See id. (citing Scindia Steam Nav. Co. v. De Los Santos, 451 U.S. 156, 101 S. Ct. 1614 (1981)).  The

---

[5] Defendants note that the Fifth Circuit has only extended the West holding to situations involving an open and obvious defect that an independent contractor is retained by the vessel owner to repair or inspect.  See Record Document 30-1 at 15 (citing Manson Gulf, L.L.C., 878 F.3d at 137).  Moreover, Defendants concede:  "Although this line of cases arises from claims under Section 905(b) of the Longshore and Harbor Workers' Compensation Act, [we] see no reason why the rationale should not apply here insofar as this litigation concerns Defendants' duties owed to Plaintiffs in their capacities as, inter alia, owners or operators of the Well."  Id. at 15, n. 56.

scope of the statutory duty under Section 905(b) "should be fashioned with the expectation that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property."  Id.  The Humphrey court went on to explain that "a different standard applies to a longshoreman working on a vessel":

> Under section 905(b) a vessel owner owes three specific legal duties to independent contractors working on the vessel: (1) the turnover duty, (2) the duty to protect against hazards arising in areas or equipment under the vessel's active control, and (3) the duty to intervene when the vessel owner knows of a serious hazard and the stevedore improvidently decides to ignore that risk.

Id. at 545-46.

Section 905(b) clearly applies to vessel owners and longshore matters.  Because Defendants in this case are not vessel owners and Mora is not a longshoreman, Defendants point the Court to Alphin v. Marquesa Mar., S.A., 747 F. Supp. 1223 (E.D. Tex. 1990), to support their contention that Section 905(b)'s narrow duty is applicable to this matter.  In Alphin, the court noted that the case was not a longshore matter, yet nevertheless applied and relied upon the narrow duty set forth in West, Hill, and other Fifth Circuit cases.  The Alphin court reasoned:

> Negligence principles of the general maritime law control this case. Since Alphin is not a seaman, the Jones Act does not apply. Since Alphin is not a worker under the Longshore Act, the Longshore Act does not apply.
> The general maritime law does not recognize the business invitee/licensee distinctions of land-based tort law. Kermarec v. Compagine Geneorale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). The plaintiff must prove the fault of defendant in not adhering to the standard of reasonableness. One aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work. West v. United States, 361 U.S. 118, 123, 80 S.Ct. 189, 193, 4 L.Ed.2d 161 (1959). The shipowner's duty to exercise reasonable care to furnish a safe place to work does not impose liability apart from fault. Id.

A worker, such as a grain inspector, performing his duties in the course of employment, must exercise some responsibility for his own safety in the face of unavoidable risks which did not arise out of negligence. Such a worker cannot recover for injuries resulting solely from such inherent and unavoidable risks. Marshall v. Neptune Maritime, Inc., 838 F.2d 737, 738 (5th Cir.1987). An experienced worker should expect some grain residue on a vessel designed to carry grain, and slippery footing from such residue is a limited and accepted hazard. Stass v. American Commercial Lines, Inc., 720 F.2d 879, 884 (5th Cir.1983). Stass compares the danger inherent from grain dust to the inherent danger faced by ship repair/inspection workers who are injured by the condition that they are supposed to inspect or repair. See Hill v. Texaco, Inc., 674 F.2d 447 (5th Cir.1982). In longshore cases in this circuit, the courts have noted that grain dust settling on the deck of a vessel is a natural, normal occurrence during grain-loading operations. This slippery footing poses only a limited and accepted hazard. Thompson v. Cargill, 585 F.Supp. 1332, 1335 (E.D.La.1984); Giacona v. Marubeni Oceano Corp., 623 F.Supp. 1560, 1565 (S.D.Tex.1985). See also, Meserole v. M/V FINA BELGIQUE, 736 F.2d 147, 150 (5th Cir.1984) (summary judgment aff'd against longshoreman who was injured while doing repair work because he should expect a film of oil in the engine room).

The court concludes that the defendants have not breached their duty of behaving reasonably, since there is nothing the defendant, Marquesa Maritima, or the defendant Atlantic Gulf & Grain Stevedores could have done which would have prevented the fall. The court finds that the plaintiff is 100% negligent. Had the plaintiff placed both hands on the platform/ladder leading to the gangway before attempting to step up, the accident in question could have been prevented.

Id. at 1227.

Here, the Court is not persuaded by the defense's argument to apply Section 905(b)'s narrow duty instead of the duty of ordinary, reasonable care pursuant to general principles of maritime negligence law.  Mora is not a longshoreman who was injured during stevedoring operations.  Further, Mora is not alleging that a condition on the FiFi barge, which appears to have been rented and rigged up by WWC, caused his injury. Instead, Mora is alleging that the negligent and gross negligent acts of Defendants, as owners/operators, in relation to their Well are the cause of his injuries.  Additionally, Mora alleges – and cites to evidence in the summary judgment record – that Defendants,

specifically Campbell, were controlling and managing the well and pressure control operations even after WWC was retained.  Defendants' reliance on <u>Alphin</u>, a Texas federal district court case that is not binding in this matter, is simply insufficient for this Court to apply Defendants' novel argument.  Defendants' summary judgment motion based on the inherent risk contention is **DENIED**, as this Court finds that Section 905(b) does not apply.

**<u>Probable Consequences</u>**

Alternatively, Defendants argue that even if the foregoing duty analysis is adjudicated in Plaintiffs' favor, then they nevertheless owed no duty.  This argument is based on Defendants' position that the May 25, 2021 flashover was not a probable consequence of their alleged negligent conduct with respect to the May 23, 2021 blowout, considering the interplay of WWC's well-control operations occurring thereafter.  Conversely, Plaintiffs contend that the defense argument – that ignition of the gas spewing out of the well was not a foreseeable consequence of their gross negligence that caused the blowout – defies common sense.

As previously noted, the determination of the existence and scope of a duty "involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party."  <u>Consol. Aluminum Corp.</u>, 833 F.2d at 67.  A harm is reasonably foreseeable if "harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a ***probable*** result" of a defendant's conduct.  <u>In re Great Lakes</u>, 624 F.3d at 211 (5th Cir. 2010) (emphasis added).  Here, the Court notes the specific actions taken by TPIC, CCS, and WWC after the second blowout but before the flashover fire.  Such actions include the rigging up of

a FiFi barge with firefighting water cannons and shields, hiring a separate firefighting contractor, and the crew on the FiFi barge wearing varying levels of fire retardant PPE equipment.  These actions seemingly indicate that a fire falls within "harm of a general sort to persons of a general class [that] might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention" in this instance.  Consol. Aluminum Corp. v. C.F. Bean Corp., 833 F.2d 65, 68 (5th Cir. 1987).  Moreover, in a general maritime negligence case, the Fifth Circuit reasoned that "injury to property and persons from . . . escaping gas, or from a fire which might have ensued, would be examples of consequences that would be foreseeable."  Id.  Thus, Defendants' summary judgment motion based on the flashover fire not being a probable consequence is **DENIED**.

**Superseding, Intervening Cause**

Finally, Defendants submit that WWC's decision to remain in a Level 4 emergency well-control operation and to conduct such operations, despite knowing the volatile nature of the situation and the inherent risks in doing so, collectively constitutes a superseding, intervening act that relieves them from liability arising from the flashover.  The common law negligence doctrine of superseding cause applies to maritime claims.  See Poincon, 9 F.4th at 297.  Pursuant to the superseding cause doctrine, "a party may not be liable for admittedly negligent conduct."  Starr Indem. & Liab. Co., 665 F.Supp.3d at 794.  The doctrine is invoked when a "defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable."  Id.  Notwithstanding, "an intervening act is not a superseding cause of harm to another if the actor at the time of his negligent conduct

should have realized that a third person might so act, a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent." Id. (quotations omitted).

Here, the cause of the flashover is unknown.  Yet, authority over the well and pressure control operations and who precisely was in charge immediately prior to and at the time of the flashover are in dispute.  Plaintiffs have also presented summary judgment evidence that Campbell withheld information regarding the pressure rating of one of the blind shear rams and WWC personnel such as Robichaux relied on such misinformation in deciding to continue WWC's operations at the Well.  "Questions of causation in admiralty are questions of fact," and they are best left to the factfinder . . . when there is a genuine dispute."  Poincon, 9 F.4th at 297.  Thus, this Court believes causation – and more specifically, the presence of a superseding, intervening cause – is not a matter to be decided at the summary judgment stage and is a determination that should be reserved for the jury. Thus, Defendants' summary judgment motion based on the presence of a superseding, intervening cause that relieves them from liability arising from the flashover is **DENIED**.

## CONCLUSION

For the foregoing reasons, the Court finds that summary judgment in favor of Defendants as to Plaintiffs' general maritime negligence clams is not appropriate as a matter of law.  TPIC and CCS's Motion for Summary Judgment (Record Document 30) be and is hereby **DENIED**.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana on this _11th_ day of April, 2024.

_____
United States District Judge